BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Plaintiff–Appellant,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, Defendant–Appellee.

No. 85–4137.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 8, 1986.

Decided Feb. 11, 1988.

Harold A. Ross, Cleveland, Ohio, for plaintiff-appellant.

Richard J. Schreiber, Fort Worth, Tex., for defendant-appellee.

Before TANG, PREGERSON, and ALARCON, Circuit Judges.

PREGERSON, Circuit Judge:

In this appeal, we must decide whether the Railway Labor Act ("RLA") bars Burlington Northern Railroad Company ("BN") from unilaterally implementing a mandatory urine testing program designed to restrict alcohol and narcotics use by on-duty railroad workers. The program requires the entire operating crew of a train to submit to urinalysis when the train is involved in a "human factor" accident unless "responsibility [for the accident] is clearly identified." When responsibility it clearly identified, only those responsible for the accident are tested.

Our resolution of this matter hinges on whether the challenge of the Brotherhood of Locomotive Engineers ("BLE") to BN's urine testing program is a major or minor dispute under the RLA. The district court held that it is a minor dispute because it is "arguably justified" under an implied provision of the collective agreement between BN and BLE. We disagree.

## FACTS

For at least 40 years, BN, like many railroads, has enforced a unilaterally implemented safety rule, Rule G. Rule G prohibits BN employees from using alcohol or narcotics while on duty, from possessing such substances while on company property, and from reporting for duty in a state of intoxication that may impede their ability to perform their work safely.[1] The collective bargaining agreements between BN and its employees' unions do not expressly or implicitly refer to Rule G.

---

1. Rule G presently states:
   The use of alcoholic beverages, intoxicants, narcotics, marijuana, or other controlled substances by employees subject to duty, or their possession or use while on duty or on company property is prohibited. Employees must not report for duty under the influence of any marijuana, or other controlled substances, or medication, including those prescribed by a doctor, that may in any way adversely affect their alertness, coordination, reaction, response or safety.
   BN unilaterally added the reference to "marijuana, or other controlled substances" in 1980.

Undisputed evidence presented to the district court indicated that, before May 1984, BN relied primarily upon sensory surveillance to enforce Rule G. If an employee's gait, breath, odor, slurred speech, bloodshot eyes, or errant behavior suggested to a supervisor or security officer that the employee was intoxicated, BN suspended the employee pending a formal investigation under established procedures. An employee could avoid suspension by voluntarily submitting to urinalysis.

On April 15, 1984, a train crash in Wiggins, Colorado killed five BN employees and caused $2 million in property damage. The National Transportation Safety Board implicated alcohol abuse by an engineer as a possible cause of the accident. On April 21, a train disobeyed an "absolute stop" signal and crashed into a standing train at Newcastle, Wyoming. Two BN employees died. Property damage totaled $1 million. A toxicology report indicated that three crew members had marijuana traces in their body fluids.

Following these two serious crashes, BN intensified its efforts to enforce Rule G by introducing two new programs. First, BN contracted for trained sniffer dogs to detect narcotics on its premises.[2] Second, it began requiring all crew members involved in a human factor accident or operating rule violation to attend a clinic immediately and submit to urinalysis for the presence of narcotics, unless responsibility for the accident or violation otherwise has been clearly identified. Under the new rule, an employee who refuses to submit to mandatory urinalysis after being involved in a human factor accident or operating rule violation is subject to discipline for insubordination.

BLE strenuously opposed BN's new urine testing program and urged BN to end it. BN refused to negotiate. BLE then balloted its branch chairmen on whether to strike on the urinalysis issue. The majority of respondents voted in favor of a strike. BLE filed suit under the RLA. The district court found that BN's urine testing pro-

gram was "arguably justified" under the collective agreement as amended by custom and practice, and thus constituted a "minor dispute" under the RLA. *Brotherhood of Locomotive Eng'rs v. Burlington N.R.R.*, 620 F.Supp. 173, 175 (D.Mont.1985). Accordingly, the court concluded that it lacked jurisdiction over the dispute, and granted summary judgment in favor of BN. BLE appeals. We reverse.

## STANDARD OF REVIEW

Whether a matter constitutes a mandatory subject of bargaining under the RLA is a question of law which we review de novo. *See Japan Air Lines Co. v. IAM*, 538 F.2d 46, 52–53 (2d Cir.1976); *cf. NLRB v. Int'l Harvester Co.*, 618 F.2d 85, 87 (9th Cir. 1980).

Whether past conduct constitutes custom and practice sufficient to be incorporated as an implied term in a collective agreement covered by the RLA is a question of fact. *See Missouri Pac. Joint Protective Bd., Bhd. Railway Carmen of the United States and Canada v. Missouri Pac. R.R.*, 730 F.2d 533, 537 (8th Cir.1984); *cf. Hass v. Darigold Dairy Prods. Co.*, 751 F.2d 1096, 1101 (9th Cir.1985) (implied terms in collective agreement under NLRA). We accept a district court's determination of questions of fact unless clearly erroneous. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Whether a dispute constitutes a major dispute or a minor dispute under the RLA is a matter of law which we review de novo. *IAM v. Aloha Airlines, Inc.*, 776 F.2d 812, 815 (9th Cir.1985).

## ANALYSIS

BN presents alternative arguments in support of its contention that the district court may not enjoin the mandatory urine testing program. First, BN contends that the enforcement of Rule G is a matter

---

2. BLE's challenge to BN's sniffer dog program is addressed in our companion case, *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 838 F.2d 1102 ("the sniffer dog case").

entirely within its managerial prerogative. Alternatively, BN contends that the challenged procedure presents only a minor dispute—over which the district court lacks jurisdiction—because it is arguably justified by implied-in-fact and implied-in-law terms of the collective agreement. We address these arguments in turn.

## I. *Management Prerogative*

Neither party disputes that Rule G itself is an implied term of the collective agreement. BN asserts, however, that selection of the *method* used to enforce a safety rule like Rule G is entirely a matter of management prerogative, not subject to collective bargaining under the RLA. Thus, BN contends, its prior enforcement practice cannot be an implied condition of the collective agreement or give rise to a labor dispute within the terms of the RLA.

Under the RLA, certain matters are always subject to collective bargaining; other matters fall within the scope of management prerogative, and are not subject to collective bargaining. The RLA requires railroads "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, *and working conditions.*" 45 U.S.C. § 152 (emphasis added). No court has comprehensively explained the scope of the statutory phrase "working conditions."

In *Japan Air Lines Co. v. IAM*, 538 F.2d 46, 52 (2d Cir.1976), the second circuit upheld an employer's management prerogative to determine whether to cease subcontracting ground work at certain airports because the "primary impact" of the union's proposal did not affect the working conditions of the union's *present* members. 538 F.2d at 52. In so holding, the court distinguished the facts of the case before it from those presented in *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), and *Order of Railroad Telegraphers v. Chicago & North Western Railway Co.*, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960), in which

"the critical question was whether those who were working were to lose their jobs." 538 F.2d at 52–53.

▮▮▮ Thus, the *Japan Air Lines* court set forth a simple and pragmatic approach: The RLA requires parties to bargain over any proposal whose primary impact is the loss—or potential loss—of existing employment or employment-related benefits. We now adopt this approach as the rule of this circuit. Under BN's chemical testing program, a Rule G violation, however discovered, could result in an employee's discharge. Because jobs of present employees are jeopardized, BN's mandatory urine testing program is a mandatory subject of bargaining under the RLA and may not be implemented unilaterally. Thus, BN's management prerogative claim is unfounded.

## II. *Major vs. Minor Dispute*

Under the Railway Labor Act, all disputes between railroads and their employees are either "major disputes" or "minor disputes." These two categories are "sharply distinguished." *See Elgin, Joliet & Eastern Ry. v. Burley*, 325 U.S. 711, 722, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945), *aff'd on rehearing*, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946); *O'Donnell v. Wien Air Alaska, Inc.*, 551 F.2d 1141, 1145–46 (9th Cir.1977) (tracing historical development of RLA).[3]

Major disputes "concern [either] the formation of collective bargaining agreements or efforts to secure new rights and incorporate them into future agreements." *Aloha*, 776 F.2d at 815 (citing *Elgin*, 325 U.S. at 723, 65 S.Ct. at 1290). Minor disputes involve the interpretation or application of existing collective bargaining agreements. *Elgin*, 325 U.S. at 723, 65 S.Ct. at 1290; *Aloha*, 776 F.2d at 815.

Generally, *major* disputes are "left for settlement entirely to the processes of noncompulsory adjustment." *Elgin*, 325 U.S. at 723–24, 65 S.Ct. at 1290. A detailed procedure is provided in 45 U.S.C. §§ 152, 155, 156, 157, and 160 for moving the dis-

---

**3.** The terms "major dispute" and "minor dispute" are not found anywhere in the RLA. The Supreme Court in *Elgin* coined the terms as a

methodology to be used by courts confronted with disputes arising under the RLA. *See Aloha*, 776 F.2d at 815 n. 2.

pute through initial conference and negotiation, submission to the National Mediation Board, voluntary arbitration, and, possibly, investigation by a special emergency board appointed by the President. *See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). "No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration." *Elgin*, 325 U.S. at 725, 65 S.Ct. at 1291. Pending the exhaustion of the RLA's mechanisms for resolving a major dispute, the status quo applies. The duty to maintain the status quo may be enforced by obtaining injunctive relief in a federal district court. *See Aloha*, 776 F.2d at 816.

In contrast, *minor* disputes are subject to compulsory and binding arbitration. *See* 45 U.S.C. § 153(first)(i). This task is performed by the National Railroad Adjustment Board or a privately established arbitration panel. *See generally* Seidenberg, *Grievance Adjustment in the Railroad Industry* in *The Railway Labor Act at Fifty* 229–35 (National Mediation Board ed., 1976). The arbitrators have *exclusive* jurisdiction over minor disputes. *See Slocum v. Delaware, Lackawanna & W.R.R.*, 339 U.S. 239, 244–45, 70 S.Ct. 577, 580, 94 L.Ed. 795 (1950). Thus, federal courts have no subject matter jurisdiction over minor disputes. *Aloha*, 776 F.2d at 815. When only a minor dispute is involved, there is no duty to maintain the status quo and judicial review of the arbitration panel's decision is extremely limited. *See Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 91, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978) (per curiam).

The test in our circuit for determining whether a dispute involves only the interpretation or application of an existing agreement (and is therefore minor) or involves the formation of a collective agreement or a unilateral effort to change working conditions (and is therefore major) was established in *Switchmen's Union of North America v. Southern Pacific Co.*, 398 F.2d 443, 447 (9th Cir.1968). *See Aloha*, 776 F.2d at 815–16; *O'Donnell*, 551

F.2d at 1146–47; *Southern Pac. Transp. Co. v. United Transp. Union*, 491 F.2d 830, 832 (9th Cir.), *cert. denied*, 416 U.S. 985, 94 S.Ct. 2389, 40 L.Ed.2d 762 (1974). We have reformulated the test several times. *See Switchmen's*, 398 F.2d at 447 (only if the disputed action is "in nowise contemplated or arguably covered by the agreement" does it give rise to a major dispute); *Southern Pac. Transp. Co.*, 491 F.2d at 832–33 (A dispute is minor when a contract provision is "reasonabl[y] susceptible" to a party's interpretation.); *O'Donnell*, 551 F.2d at 1146 ("Is the position of at least one of the parties *arguably* predicated on the terms of an agreement?"); *Aloha*, 776 F.2d at 816 (major dispute concerns issue "neither contemplated nor arguably covered" by collective agreement).

The district court accurately summarized the essence of these various reformulations as *whether the railroad's actions are "arguably justified" by the collective agreement* between BN and the BLE. *See* 620 F.Supp. at 175. If the railroad's actions *are* arguably justified, the dispute is a *minor* dispute; if they are *not* arguably justified, the dispute is a *major* dispute. When in doubt, courts construe disputes as minor. *See O'Donnell*, 551 F.2d at 1146–47 (*Switchmen*'s test "is not a stringent one"); *Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Railway Co.*, 768 F.2d 914, 920 (7th Cir. 1985) (citing cases).

A railroad collective agreement includes not only express terms, but terms implied by past practice and by law. *See Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969) (the status quo in a major dispute includes employment terms established by past practice); *Maine Cent. R.R. v. United Transp. Union*, 787 F.2d 780, 782–83 (1st Cir.) (railroad's assertion that proposed action comported with past custom and practice was arguably correct and thus dispute was minor), *cert. denied*, — U.S. ——, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986); *Railway Labor Executives' Ass'n v. Atchison, Topeka & Santa Fe Ry.*, 430 F.2d 994, 996 (9th Cir.1970) (parties' failure to include a provision in the agreement

may indicate that they were relying on the language of a statute to fill the gap), *cert. denied*, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971).

It is clear that BN's new mandatory urine testing program does not fall within the scope of any *express* provision of the collective agreement. Therefore, in determining whether BN's chemical testing program constitutes a major or a minor dispute, we must decide whether it is "arguably justified" by any *implied* provision of the agreement. If it *is* "arguably justified" by either a term implied by past practice (an "implied-in-fact" term) or a term implied by statute or regulation (an "implied-in-law" term), then the dispute is minor, and the federal courts lack jurisdiction to enjoin the program.

### A. *Implied–in–Fact Terms*

As an initial matter, we note that both Rule G and its customary enforcement by sensory surveillance were implied-in-fact terms of the collective agreement between BN and BLE. Several BLE officials with extensive experience regarding BN's operating procedures testified that sensory surveillance by BN's supervisors had been the only regular method of Rule G enforcement for over forty years. BLE had long acquiesced in this practice. BN has never disputed that sensory surveillance by BN's supervisors was the primary means of detecting Rule G violations before 1984.

BN contends that its urine testing program is arguably justified by the past practice of sensory surveillance. In the companion "sniffer dog case," the district court determined that the custom and practice of relying on sensory surveillance to detect Rule G violations arguably justified *any* reasonable enforcement method based on "a modicum of evidence." *Brotherhood of Locomotive Eng'rs v. Burlington N.R.R.*, 620 F.Supp. 163, 171 (D.Mont.1985). In the instant case, the district court concluded that such an implied condition arguably justified BN's mandatory urine testing program because "the use of urinalysis was [not] done on a completely random basis. Rather.... BN subjects an employee to

urinalysis when the employee is believed to have been involved in an operating rule violation." *Brotherhood of Locomotive Eng'rs v. Burlington N.R.R.*, 620 F.Supp. 173, 175 (D.Mont.1985). This conclusion ignores the critical differences between the old method and the new method: The old method of enforcing Rule G was voluntary, and required particularized suspicion; the new method is mandatory, and requires only generalized suspicion.

We do not agree that BLE, by acquiescing in Rule G's enforcement by sensory surveillance, can be said to have agreed to allow BN to implement *any* procedure beyond sensory surveillance so long as the procedure is brought into play by a "modicum of evidence" or an "objective triggering event." The kind of sensory surveillance that BN's supervisors had employed in the past—observing an employee's gait, breath, odor, slurred speech, or blood shot eyes—was non-intrusive. It did not implicate the serious privacy intrusions posed by BN's use of mandatory urine testing. Moreover, the sensory surveillance employed by BN's supervisors in the past required suspicion of individual workers based on their conduct and appearance, whereas the new mandatory urine testing procedure may be imposed on the basis of generalized suspicion encompassing an entire train crew.

Our analysis here is aided by reference to fourth amendment doctrine. BN is not a government agency and, therefore, is not subject to the restrictions of the fourth amendment. However, the focus of our inquiry—both under the fourth amendment and under an implied provision of a collective agreement—is the expectation of privacy of those who will be subject to urine testing. *See O'Connor v. Ortega*, —— U.S. ——, 107 S.Ct. 1492, 1497–99, 94 L.Ed.2d 714 (1987) (reasonableness of a search under the fourth amendment depends on reasonable expectations of privacy); *Shoreline*, 396 U.S. at 153, 90 S.Ct. at 301 (the terms of a collective agreement include "actual, objective working conditions and practices, broadly conceived....").

In *Railway Labor Executives' Association v. Burnley*, 839 F.2d 575 (9th Cir.1988), we struck down federal railway safety regulations requiring a mandatory chemical testing program similar to BN's program at issue here. We concluded in *Burnley* that the fourth amendment requires "a degree of particularized suspicion" of the use of alcohol or a controlled substance before a railroad employee can be subject to mandatory drug testing. This analysis is readily applicable here. A railroad worker has certain expectations regarding whether the government may invade his or her privacy under the fourth amendment. Similarly, a railroad worker has certain expectations regarding whether an employer may engage in a similar invasion of privacy under an implied provision of a collective agreement. These expectations are related: Although the source of the invasion is different, the privacy interest is the same. In the case of urine testing programs, the Constitution draws a line between those programs based on particularized suspicion and those based on generalized suspicion. *Burnley* at 584. The former are permissible; the latter are not. We decline to assume that BLE members implicitly granted BN the authority to invade their privacy in ways the government could not.

■ BN's new mandatory urine testing program is a clear change in working conditions governed by the collective agreement and, thus, by definition, a major dispute. It is a mistake to conclude that BLE impliedly agreed to the new testing program just because "through custom and practice" it had for forty years accepted enforcement of Rule G by the non-intrusive procedure of sensory surveillance. BN's new procedure requiring mandatory urine testing of all members of a train's crew is not arguably justified by the implied provision in the collective agreement allowing BN to enforce Rule G by voluntary urinalysis based on information from sensory surveillance.

B. *Implied–in–Law Terms*

BN also contends that its new mandatory testing program is justified by an implied-in-law provision of the collective agreement. It argues that federal regulations mandating chemical testing of railroad workers constitute an implied-in-law term of its agreement with BLE.

It is true that Federal Railway Administration regulations mandated a chemical testing program similar to the program imposed unilaterally by BN. *See* 49 C.F.R. §§ 219.201, 219.203, and 219.213. However, we have struck these regulations down on constitutional grounds. *Railway Labor Executives Ass'n v. Burnley*, 839 F.2d 575. They no longer retain any legal force. No other legislative or administrative pronouncement stands either for or against the challenged program. Therefore, generalized mandatory urine testing is not an implied-in-law condition of the collective agreement, and BLE's resistance to that program constitutes not a minor, but a major dispute.

REVERSED AND REMANDED.

ALARCON, Circuit Judge, dissenting:

I respectfully dissent. I would hold that BN's testing practice is arguably permitted under the parties' implied agreement. Therefore, the dispute is minor and should be referred to the National Railway Adjustment Board for resolution.

The majority's opinion is contrary to the Eighth Circuit's well-reasoned analysis of precisely the same issue in *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R.*, 802 F.2d 1016 (8th Cir.1986). Indeed, the only difference between the question presented in this matter and the issue before the Eighth Circuit is the identity of the union challenging the testing policy. In all other respects the facts and legal questions are identical. The majority's opinion creates an intercircuit conflict. I would adopt the Eighth Circuit's analysis and affirm the district court.

I cannot join in the majority opinion because I believe that the reasoning process employed by my esteemed colleagues is critically flawed. The majority acknowledges that the test for determining if a

particular labor practice raises a major or minor dispute is whether the disputed action is "arguably permitted" by the collective bargaining agreement. Thus, the issue presented in this matter is whether post-incident testing is arguably permitted by Rule G.

After correctly stating the applicable test, the majority proceeds to ignore it. Instead of determining whether post-incident testing is arguably permitted by Rule G, the majority abandons the proper test and applies the Fourth Amendment to an agreement between non-governmental actors. In determining whether the testing policy is arguably permitted by the agreement, the majority first inquires whether the *Government* could undertake the post-incident testing procedures prescribed by BN. The majority then responds to this false issue by arguing that if such tests were performed by the government they would violate the Fourth Amendment. The majority then concludes that post-incident testing is not encompassed within the collective agreement because it "decline[s] to assume that BLE members implicitly granted BN the authority to invade their privacy in ways the government could not."

The Fourth Amendment has no bearing on the *parties'* understanding of their rights and obligations under the collective bargaining agreement. The majority's new test would make the intention of the parties irrelevant to a proper interpretation of their agreement. The law of this circuit, however, dictates that we focus on the collective bargaining agreement in determining whether post-incident testing is arguably permitted. *Int'l Assoc. of Machinists & Aerospace Workers v. Aloha Airlines, Inc.*, 790 F.2d 727, 815–16 (9th Cir. 1986) (Pregerson, J.), *cert. denied* —— U.S. ——, 107 S.Ct. 400, 93 L.Ed.2d 354. Private parties are free to enter into agreements in the interests of public safety and the welfare of co-workers that permit a limited intrusion into privacy rights. The Fourth Amendment is directed at governmental intrusions into privacy interests. *United States v. Jacobsen*, 466 U.S. 109, 113–14, 104 S.Ct. 1652, 1656–57, 80 L.Ed.2d 85 (1984). It has not previously been ap-

plied by any court to the conduct of private parties. Furthermore, neither party suggested in its briefs or at oral argument that a Fourth Amendment analysis can be applied to the interpretation of an agreement between a union and a private employer.

The majority has failed to explain why it did not request additional briefing and oral argument concerning this radical departure from fourth amendment analysis and the law of this circuit regarding the interpretation of collective bargaining agreements. The General Orders of this Circuit provide that "[i]f a panel determines to decide a case upon the basis of a significant point not raised by the parties in their briefs, it should give consideration to requesting additional briefing before issuing a disposition predicated on the particular point." The United States Court of Appeals for the Ninth Circuit, *General Order* 13 (September, 1987).

## I.  FACTS AND PROCEDURAL HISTORY

This dispute arises out of BN's change in the procedure used to detect violations of Rule G. Rule G provides:

> The use of alcoholic beverages, intoxicants, narcotics, marijuana, or other controlled substances by employees subject to duty, or their possession or use while on duty or on company property, is prohibited. Employees must not report for duty under the influence of any marijuana or other controlled substances, or medication, including those prescribed by a doctor, that may in any way adversely affect their alertness, coordination, reaction, response or safety.

Any on-duty employee found to be in violation of Rule G is subject to suspension or discharge. Rule G has been in effect at BN and in the railroad industry in slightly varying forms for at least 40 years. The parties' collective bargaining agreements are silent as to the methods of implementing Rule G or detecting and enforcing violations thereof.

For many years, BN relied upon sensory observations to detect Rule G violations. Employees were suspected of Rule G violations if BN trainmasters and superintendents observed symptoms of intoxication such as staggering, slurred speech, bloodshot eyes, or alcoholic breath. If a BN officer detected alcohol or drug use by an employee, the worker was asked to take a urine test to clear himself. Under the prior practice, an employee was not requested to submit to a urine test until there was sufficient facts to establish "probable cause" to believe that the employee had violated Rule G. If the employee refused to take the urine test, he was not disciplined for insubordination. However, an employee could be suspended for violation of Rule G based solely on the presentation of evidence of a visual observation of objective symptoms of intoxication.

In 1984, two accidents occurred on BN trains in which several individuals were fatally injured. The evidence gathered by BN investigators pointed to controlled substance or alcohol impairment by the operating crews. Shortly after these tragic events, BN intensified use of urine testing.[1] On November 5, 1984, Charles J. Bryan, BN's Senior Vice-President of Operations, distributed a memorandum (hereinafter the Bryan Memorandum) to BN officers which "amplifi[ed] and restat[ed] BN's existing policy defining when 'probable cause' exists sufficient to require urinalysis tests to detect possible Rule G violations by BN operating employees." Under the Bryan Memorandum's interpretation of the sweep of Rule G, blood or urine testing became mandatory following an accident or operating rule violation. The Bryan Memorandum directed that "when responsibility is clearly identified," a train's entire operating crew, or separate individuals be sent to a clinic for a urinalysis sample after (1) a "major human factor accident," i.e., a major collision involving more than one train or one switching movement, (2) a "minor human factor accident," i.e., derailments in yard or industry switching, failures to respond to signals, run through switches or derails, and failures to secure, and (3) a BN supervisor detects an employee displaying abnormal behavior. Blood or urine testing is required only following a human-factor accident, not an equipment-related accident. An employee who refuses to submit to a blood or urine test is subject to discipline for insubordination.

BN also utilized trained dogs to detect the possession of controlled substances (hereinafter sniffer dogs) prohibited by Rule G. The Brotherhood filed a complaint on August 29, 1984, seeking declaratory and injunctive relief challenging the use of sniffer dogs. The district court determined that the dispute regarding the use of sniffer dogs was major and granted a permanent injunction. The issue raised by the random use of sniffer dogs is presented in a companion case filed this same date. *Brotherhood of Locomotive Eng'rs v. Burlington Northern R.R.*, 838 F.2d 1102 (hereinafter the sniffer dog case.)[2]

In December 1984, Robert E. Pelava, the General Chairman for the Brotherhood, notified BN that the Brotherhood objected to the mandatory urine or blood testing practice. BN and the Brotherhood unsuccessfully attempted to resolve the dispute. The Brotherhood then sought to amend its complaint in the sniffer dog case to enjoin the mandatory blood or urine testing. The district court denied the motion to amend the pleading.

On January 7, 1985, BN filed a notice of intent to submit the blood or urine testing issue for arbitration as a "minor" dispute

---

1. On April 15, 1984, a train crash in Wiggins, Colorado killed five BN employees and caused $2 million property damage. The National Transportation Safety Board (hereinafter NTSB) implicated alcohol abuse by an engineer as a possible cause of the accident. On April 21, 1984, a train disobeyed an absolute stop signal and crashed into a standing train at Newcastle, Wyoming. Two BN employees died and property damage totalled $1 million. A NTSB toxicology report indicated that three crew members had marijuana traces in their body fluids.

2. The district court referred to the sniffer dog case as *BLE I, Bhd. of Locomotive Eng'rs v. Burlington Northern R.R.*, 620 F.Supp. 173, 174 (D.Mont.1985).

with the Adjustment Board pursuant to 45 U.S.C. § 153, First (i), of the RLA.[3] On February 6, 1985, BN filed its formal submission to the Adjustment Board.

On February 14, 1985, the Brotherhood filed a complaint in federal district court for declaratory and injunctive relief. The Brotherhood sought (1) an injunction prohibiting BN's mandatory urine and blood testing practice, (2) an injunction prohibiting BN from proceeding with its submission before the Adjustment Board, and (3) a declaration that BN's testing practice violated the parties' collective bargaining agreements. On March 7, 1985, the Brotherhood filed a motion for a preliminary injunction. BN thereafter filed a motion to dismiss the Brotherhood's complaint. BN alleged that the Adjustment Board has exclusive subject matter jurisdiction over the question because it was a "minor" dispute under the Act.

After conducting an evidentiary hearing, the district court treated BN's motion to dismiss as a motion for summary judgment under Fed.R.Civ.P. 12(b)(6).[4] *Brotherhood of Locomotive Eng'rs*, 620 F.Supp. at 174 n. 1, 175. In addition to considering the evidence presented at the hearing on the motion for a preliminary injunction and motion to dismiss, the court took judicial notice of the record and facts established in the sniffer dog case. *Id.* at 174.

The district court noted that the collective bargaining agreements between the parties made no reference to Rule G, nor to any specific method of detecting alcohol and controlled substance abuse, or to blood or urine tests. The court found, however, that the procedure for the detection and investigation of alcohol or controlled substance abuse adopted by the railroad, and acquiesced in by the union, had existed over a substantial period of time and had become an implied provision or condition of the collective bargaining agreement. *Id.* at 175; *Brotherhood of Locomotive Eng'rs*, 620 F.Supp. at 170. As described above, the procedure employed by the railroad to implement Rule G consisted of sensory observation by a supervisor of objective symptoms of alcohol or substance abuse, such as slurred speech, staggered walk, alcoholic breath, followed by a voluntary blood or urine test, if the employee wished to clear himself of suspicion. The district court held that because the facts alleged in the Brotherhood's complaint and the evidence presented at the hearing demonstrated that BN employees were requested to submit to blood or urine tests when a specific worker was believed to have been involved in an accident or operating rule violation, the challenged mandatory blood or urine testing procedure was "arguably justified" under the terms of the "implied agreement extant between the parties." *Brotherhood of Locomotive Eng'rs*, 620 F.Supp. at 175. The district court held that it lacked subject matter jurisdiction because the dispute was minor. *Id.*

## II. STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment *de novo*, in the light most favorable to the nonmoving party, to determine whether there are any

---

**3.** 45 U.S.C. § 153, First (i) provides:

The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions ... shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

**4.** Fed.R.Civ.P. 12(b)(6) provides in pertinent part:

Every defense, in law or fact, to a claim for relief in any pleading ... shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted.... If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56....

genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986).

## III. RESOLUTION OF DISPUTES UNDER THE ACT

The fundamental issue raised in this action is whether BN's implementation of its mandatory urine and blood testing practice to detect Rule G violations, following an accident or an operating rule violation, constitutes a change in working conditions accomplished in violation of the notice, negotiation, and mediation requirements imposed by sections 2 and 6 of the RLA, 45 U.S.C. §§ 152, Seventh, and 156.[5] Resolution of this issue depends on whether the controversy between the Brotherhood and BN is a "major" or "minor" dispute under the Act.[6]

Major disputes involve

the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

325 U.S. at 723, 65 S.Ct. at 1290; 790 F.2d at 730 n. 1. In contrast, minor disputes presuppose the existence of an agreement

or "a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Elgin,* 325 U.S. at 723, 65 S.Ct. at 1290; *Aloha Airlines,* 790 F.2d at 730 n. 1. The distinction between major and minor disputes is imprecise and has plagued the courts. *O'Donnell v. Wien Air Alaska, Inc.,* 551 F.2d 1141, 1146 (9th Cir.1977).

### A. *Major Disputes*

The distinction between major and minor disputes has important consequences regarding the applicable procedures for dispute resolution and the authority of the courts to intervene. *Id..* The railroad must give at least, 30 days notice of a proposed change in the "rates of pay, rules, or working conditions." 45 U.S.C. § 156. A dispute arising from the proposed change is known as a major dispute. *O'Donnell,* 551 F.2d at 1146. The parties are required to confer and "to exert every reasonable effort" to settle disputes. 45 U.S.C. § 152, First.[7] If conference fails, either party may invoke the services of the National Mediation Board. 45 U.S.C. § 155. If mediation fails, the Mediation Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can only take place if both parties consent. 45 U.S.C. §§ 155, First, 157. If arbitration is rejected, the parties

---

5. 45 U.S.C. § 152, Seventh, provides: "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."
  45 U.S.C. § 156 provides in pertinent part: Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference....

6. The RLA does not use the terms "major" and "minor" to distinguish disputes. *Int'l Assoc. of Machinists v. Aloha Airlines, Inc.,* 776 F.2d 812, 815 n. 2 (9th Cir.1985). The terminology was utilized by the Supreme Court in *Elgin, J. & E. Ry. v. Burley,* 325 U.S. 711, 722-28, 65 S.Ct. 1282, 1289-92, 89 L.Ed. 1886 (1945).

7. The RLA treats major and minor disputes alike in requiring negotiation as the first step toward settlement. 45 U.S.C. § 152, First, Second. 45 U.S.C. § 152 provides:
    First. It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise....
    Second. All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute.

are relegated to self-help in adjusting the dispute. *Brotherhood of Locomotive Eng'rs v. Baltimore & O.R.R. Co.,* 372 U.S. 284, 291, 83 S.Ct. 691, 695, 9 L.Ed.2d 759 (1963) (per curiam); *Trans Int'l Airlines, Inc. v. Int'l Brotherhood of Teamsters,* 650 F.2d 949, 960 (9th Cir.1980), *cert. denied sub. nom., Air Line Pilots Assoc. Int'l v. Trans Int'l Airlines, Inc.,* 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981). If the dispute threatens "substantially to interrupt interstate commerce," the President may create an emergency board to investigate and report on the dispute. 45 U.S.C. § 160.

The RLA requires both parties to maintain the status quo of a major dispute during the mediation and conference process. 45 U.S.C. §§ 152, 155, 156, 160; *see Detroit & T.S.L.R.R. v. United Transp. Union,* 396 U.S. 142, 149, n. 14, 90 S.Ct. 294, 298, n. 14, 24 L.Ed.2d 325 (1969). A district court may enjoin either party from violating the status quo. *See O'Donnell,* 551 F.2d at 1146. The procedures of the RLA to resolve major disputes are purposely long and drawn out in the hope that reason and practical considerations will in time provide an agreement that resolves the dispute. *Brotherhood of Ry. & S.S. Clerks v. Florida E.C. Ry.,* 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966).

B. *Minor Disputes*

If a railroad takes action arguably permitted under the collective bargaining agreement, *not* entailing a change in rates of pay, rules, and working conditions, a union's opposition based on a differing interpretation of the agreement is considered to be a minor dispute subject to binding adjudication by the Adjustment Board. *O'Donnell,* 551 F.2d at 1146–47. Either party may submit the dispute to the Adjustment Board for decision, provided the party has discharged the initial duty of attempting to resolve the issue through negotiation. 45 U.S.C. § 153, First (i). The Adjustment Board is an administrative tribunal composed of workers and management, 45 U.S.C. § 153, First (a), (h), created to secure the prompt, orderly, and final

settlement of minor disputes that arise between employees and railroads regarding rates of pay, rules, and working conditions. *Union Pacific R.R. v. Sheehan,* 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978). The Adjustment Board has exclusive jurisdiction to resolve minor disputes. 45 U.S.C. § 153, First (i); *accord Slocum v. Delaware, L. & W.R.R.,* 339 U.S. 239, 244–45, 70 S.Ct. 577, 580, 94 L.Ed. 795 (1950); *Brotherhood of R.R. Trainmen v. Denver & R.G.W.R.R.,* 290 F.2d 266, 269 (10th Cir.), *cert. denied,* 366 U.S. 966, 81 S.Ct. 1925, 6 L.Ed.2d 1256 (1961). The federal courts have no jurisdiction to adjudicate the merits of a minor dispute. *Aloha Airlines,* 776 F.2d at 815.

In establishing the procedures for dispute resolution, Congress considered it essential to keep "minor" disputes within the Adjustment Board and out of the courts. *Sheehan,* 439 U.S. at 94, 99 S.Ct. at 402. In *Slocum,* the Supreme Court stated that the Adjustment Board is better suited to resolve minor disputes in the railroad industry involving the application or interpretation of an agreement than federal courts:

> The Act thus represents a considered effort on the part of Congress to provide effective and desirable administrative remedies for adjustment of railroad-employee disputes growing out of the interpretation of existing agreements. The Adjustment Board is well equipped to exercise its congressionally imposed functions. Its members understand railroad problems and speak the railroad jargon. Long and varied experiences have added to the Board's initial qualifications. Precedents established by it, while not necessarily binding, provide opportunities for a desirable degree of uniformity in the interpretation of agreements throughout the nation's railway systems.

339 U.S. at 243, 70 S.Ct. at 579 (footnote omitted); *see Order of Ry. Conductors v. Pitney,* 326 U.S. 561, 567, 66 S.Ct. 322, 325, 90 L.Ed. 318 (1946).

A controversy arises, as in the present case, when a union believes a railroad has unilaterally changed working conditions in

violation of the bargaining and mediation procedures imposed by 45 U.S.C. §§ 152, Seventh, and 156, thus creating a major dispute, and a railroad believes its challenged action is arguably permitted by the terms of the parties' agreements, and is therefore, subject to resolution only by the Adjustment Board under 45 U.S.C. § 153, First (i), as a minor dispute.

### C. The Test To Determine a Minor Dispute

As a threshold issue, the Brotherhood contends the use of the "arguably justified" test by the district court to determine if the dispute is major or minor is "questionable." The question whether a district court applied the correct test to determine if a dispute is minor or major under the Act is a question of law which we review *de novo. See Aloha Airlines,* 776 F.2d at 815 (the question whether a dispute is major or minor is a "narrow question of law.").

This court has consistently followed the rule in *Switchmen's Union of N. Amer. v. Southern Pacific Co.,* 398 F.2d 443 (9th Cir.1968) in determining whether a dispute is major or minor. *O'Donnell,* 551 F.2d at 1147. A dispute is minor if the position of at least one of the parties is arguably predicated on the terms of the collective bargaining agreement. *Switchmen's Union,* 398 F.2d at 447; *O'Donnell,* 551 F.2d at 1146. Stated another way, a dispute is minor if the parties' agreement is "reasonably susceptible" to the railroad's interpretation. *Southern Pacific Transp. Co. v. United Transp. Union,* 491 F.2d 830, 833 (9th Cir.), *cert. denied,* 416 U.S. 985, 94 S.Ct. 2389, 40 L.Ed.2d 762 (1974). On the other hand, "if it can be said that the change being imposed by one side on the other is in nowise contemplated or arguably covered by the agreement," the dispute is major. *Switchmen's Union,* 398 F.2d at 447. The test "is not a stringent one in view of the substantial and longstanding interest in removing labor disputes from the federal courts and placing them in the expert hands of the various arbitration and mediation facilities." *O'Donnell,* 551 F.2d at 1146–47.

In the instant case, the district court posed the issue as follows: "[W]hether the urinalys[i]s practice is 'arguably justified' by the implied agreement, regarding Rule G, found to exist between the Brotherhood and the BN . . . ." *Brotherhood of Locomotive Eng'rs,* 620 F.Supp. at 175. Thus, the district court applied the appropriate test to determine whether the dispute was major or minor.

### IV. THE PARTIES' IMPLIED AGREEMENT

The Brotherhood contends the district court erred in concluding that BN's mandatory blood or urine testing practice is "arguably justified" by the parties' implied agreement regarding the procedure to be followed in the detection of Rule G violations because the testing practice (1) eliminates elements of the parties' implied agreement, (2) creates a new condition of employment, and (3) is completely distinguishable from the company's prior procedure.

A railroad is not limited to the four corners of the collective bargaining agreement to show that a change in a working condition does not constitute a major dispute. *Brotherhood of Locomotive Eng'rs v. Boston & Main Corp.,* 788 F.2d 794, 799 (1st Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 111, 93 L.Ed.2d 59. This rule is particularly applicable to the railroad industry:

> It would be virtually impossible to include all working conditions in a collective-bargaining agreement. Where a condition is satisfactorily tolerable to both sides, it is often omitted from the agreement, and it has been suggested that this practice is more frequent in the railroad industry than in most others.

*Shore Line,* 396 U.S. at 154–55, 90 S.Ct. at 301–2 (footnote omitted). The railroad can rely on " 'those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement.' " *Brotherhood of Locomotive Eng'rs v. Boston & Main Corp.,* 788 F.2d at 799 (quoting *Shore Line,* 396 U.S. at 153, 90 S.Ct. at 301). Accordingly, past practices and

working conditions may become part of the collective bargaining agreement notwithstanding silence in the agreement itself. *Maine Central R.R. v. United Transp. Union,* 787 F.2d 780, 782 (1st Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 169, 93 L.Ed.2d 107; *cf. Switchmen's Union,* 398 F.2d at 447 ("where the position of one or both of the parties is expressly and arguably predicated on the terms of the agreement, *as illuminated by long-standing practices,* the question of whether the position is well taken involves a minor dispute") (emphasis added). For a past practice to be considered an "actual, objective working condition[ ]," it must have occurred "for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions." *Shore Line,* 396 U.S. at 153, 154, 90 S.Ct. at 301; *Brotherhood of Locomotive Eng'rs v. Boston & Maine Corp.,* 788 F.2d at 799.

It is undisputed that the parties' collective bargaining agreements are silent as to the procedure to be followed in detecting and testing for alcohol and substance abuse. The evidence amply demonstrates, however, that the Brotherhood has acquiesced in the procedure followed by BN in the detection and enforcement of Rule G violations for many years. The undisputed evidence established that prior to the Bryan Memorandum, BN relied upon the existence of objective indicators of alcohol or substance abuse as a prerequisite to the investigation of a possible Rule G violation. The triggering event for the investigation of a Rule G violation was the observation that a specific employee's speech was slurred, his gait was staggered, his eyes were bloodshot, or his breath smelled of alcohol. A worker observed in such a condition was cited for a Rule G violation and advised that a further investigation and a hearing might follow. When viewed in the light most favorable to the Brotherhood, the evidence supports the district court's determination that "the practice of detecting Rule G violations by means of sensory observation ... has achieved the level of an established practice, deserving of an implied contractual status."

## V. THE EXPANDED TESTING PROCEDURE WAS ARGUABLY JUSTIFIED

The next inquiry should be whether the implied agreement—that BN could require further investigation for a Rule G violation after the perception of facts that a specific worker had exhibited symptoms of alcohol or substance abuse—arguably includes the right to conduct blood or urine testing, after an accident or operating rule violation, to confirm or disprove a violation of Rule G. If blood or urine testing following an accident or operation rule violation is arguably included in the implied terms of the collective bargaining agreement, the procedure set forth in the Bryan Memorandum presents a minor dispute.

The Brotherhood contends that the district court erred in granting summary judgment because material facts are in dispute. The Brotherhood argues that the evidence shows that the mandatory blood or urine testing practice is not "arguably justified" by the parties' implied agreement because prior to the release of the Bryan Memorandum, (1) no employee was subjected to a compulsory body fluid test solely because he was involved in an accident or operation rule violation, (2) agents of BN admitted that the mandatory testing practice was "new," and (3) the testing after the perception of symptoms of alcohol or substance abuse was optional, not mandatory.

Summary judgment is appropriate if the plaintiff cannot prevail as a matter of law when the facts are viewed in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted"). Under this court's test to determine if a dispute is minor, the challenged conduct need not exactly mirror the practices which have become an implied provision of the collective bargaining agreement. The challenged conduct need only be *arguably* covered by the parties' implied agreement to be a minor dispute.

*Switchmen's Union,* 398 F.2d at 447; *O'Donnell,* 551 F.2d at 1146; *see Southern Pacific Transp. v. United Transp. Union,* 491 F.2d at 833; *accord Brotherhood of Ry. Carmen v. Norfolk & W. Ry. Co.,* 745 F.2d 370, 376–77 (6th Cir.1984) ("courts are called upon to determine only whether the railroad's contention is arguable, not to determine whether that contention is correct").

While it is true that as a result of the Bryan Memorandum, blood or urine testing became mandatory following an accident or operating rule violation, I agree with the district court that the testing practice nonetheless is arguably permitted under the parties' implied agreement. Both the old and the new procedure involve similar triggering events: the discovery of objective facts suggesting alcohol or substance abuse followed by the use of blood or urine testing to determine if the employee had violated Rule G. Whether mandatory testing is arguably consistent with the prior practice of affording an employee the opportunity to clear himself by a chemical test presents a minor dispute outside the jurisdiction of a federal court. Once a railroad has presented evidence of a past practice that was accepted by the union which, arguably, could support its interpretation of the agreement, the court's inquiry must end; the duty to weigh and decide who has the better argument is the arbitrator's function. *Maine Cent. R.R. v. United Transp. Union,* 787 F.2d at 782.

The fact that management referred to the blood or urine test procedure as "new" is not controlling. The major-minor dispute dichotomy does not turn on the terminology employed by the parties, but on the substance of the dispute. *Switchmen's Union,* 398 F.2d at 447. It is undisputed that the mandatory blood or urine testing practice following an accident or rule violation was an innovation. I agree with the district court that it is arguable that because the present procedure does not come into play unless there is an objective triggering event which justifies the investigation of a suspected Rule G violation, the urine or blood testing falls within the implied contractual condition of the collective bargaining agreement.

Since there is no genuine issue of material fact that might affect the outcome of the suit, *Anderson v. Liberty Lobby, Inc.,* 106 S.Ct. at 2510–11, the district court correctly concluded that the mandatory urine or blood testing practice presents a minor dispute.

My conclusion that post-incident testing poses only a minor dispute is supported by the Eighth Circuit's recent decision in *Brotherhood of Maintenance of Way Employees.* In that case, BN's maintenance of way workers also sought to enjoin application of BN's post-incident testing policy contending that it presented a major dispute under the RLA.

The district court found that the union had acquiesced in BN's non-random "sensory surveillance" method of enforcing Rule G, and thus that that practice became an implied term of the collective agreement. *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R.,* 642 F.Supp. 41, 45 (N.D.Iowa, 1985). It held post-incident testing "arguably" could be seen as a refinement of the accepted enforcement policy because "post-accident testing ... [is] not done randomly since it ... [is] performed after an incident which ... [gives] rise to the possibility of usage of drugs and/or alcohol." *Id.* at 46–47. Accordingly, the court held that the dispute over post-incident testing was minor and thus it refused to issue the injunction. *Id.* at 47–48.

The Eighth Circuit affirmed the denial of the injunction. Inasmuch as the testing policy was not implemented randomly, it did not constitute "such a serious departure from past practice as to give rise to a major dispute." *Brotherhood of Maintenance of Way Employees,* 802 F.2d at 1023.

## VI.  CONSTITUTIONAL CLAIMS

The Brotherhood finally contends that the district court erred in granting summary judgment because the federal and state constitutional claims in the complaint were not resolved. The Brotherhood suggests

**1102**

that this court should remand the case to the district court for resolution of these claims.

To adjudicate the constitutional issues presented in the Brotherhood's pleading, the district court would have had to reach the merits of the dispute. This minor dispute must be resolved initially by the arbitration procedures set forth under the Act before judicial intervention. The district court lacks subject matter jurisdiction to intervene until the minor dispute is resolved. The district court properly stayed its hand.

### VII. MANAGEMENT PREROGATIVE

The BN contends that since no provision of the collective bargaining agreement between the parties restricts the BN with regard to the methods or procedures for detecting violations of Rule G, the method of detection is a matter within BN's managerial prerogative. Therefore, BN reasons, its unilateral implementation of a particular method of detection does not rise to the level of a labor dispute within the Act.

The mere absence of any reference in the collective bargaining agreements to a particular method or detection, standing alone, does not establish that the method which may be utilized to detect violations is a matter within the prerogative of management. The absence of specific language may reflect, as in this case, the fact that particular practices have, through acquiescence, become an implied part of the collective bargaining agreement. *Shore Line*, 396 U.S. at 155, 90 S.Ct. at 302.

### CONCLUSION

I would affirm the judgment of the district court. I would hold that BN's blood or urine testing practice is a minor dispute arguably permitted by Rule G.