**RAILWAY LABOR EXECUTIVES' ASSOCIATION, et al., Appellants,**

v.

**CONSOLIDATED RAIL CORPORATION.**

No. 87–1289.

United States Court of Appeals, Third Circuit.

Argued Nov. 3, 1987.

Decided April 25, 1988.

Lawrence M. Mann (argued), Alper & Mann, Washington, D.C., Cornelius C. O'Brien, Jr., O'Brien and Davis, P.C., Philadelphia, Pa., for appellants.

Dennis J. Morikawa (argued), Joseph J. Costello, Hermon M. Wells, Consolidated Rail Corp., Philadelphia, Pa., for appellee.

Before SLOVITER and BECKER, Circuit Judges, and COWEN, District Judge [*].

**OPINION OF THE COURT**

SLOVITER, Circuit Judge.

The issue presented by the Unions' appeal is whether the railroad's unilateral

[*] Hon. Robert E. Cowen, United States District Court for the District of New Jersey, sitting by designation. Since the argument of this appeal, Judge Cowen has become a member of this Court.

addition of a drug-screening component to its employees' medical examinations gives rise to a "minor" dispute under the Railway Labor Act over which the district court had no subject matter jurisdiction or to a "major" dispute which would entitle the parties to an injunction maintaining the status quo while they bargain over the change. This case concerns only the process pursuant to which drug screening may be introduced; it has nothing to do with whether drug screening is a good idea.

The district court concluded that the parties' prior practice with respect to medical examinations "arguably justified" the railroad's unilateral imposition of uniform drug screening and dismissed the Unions' action for want of jurisdiction. We will reverse.

## I. *Background*

### A. Facts

Plaintiffs, the Railway Labor Executives' Association, whose members head railway labor unions representing all crafts, and eighteen unions representing those crafts (hereinafter "Unions"), and defendant Consolidated Rail Corporation ("Conrail"), a railroad, have stipulated to the essential facts in this case. Since its formation in 1976, Conrail has required all employees to undergo periodic physical examination at intervals varying between one and three years depending on the employee's age and job classification, and has required an examination upon the return to duty of all employees operating trains and engines who were out of service thirty days or longer and of all other employees out of service ninety days or longer "due to furlough, leave, suspension or similar causes." App. at 71. These examinations have routinely included urinalysis for blood sugar and albumin.

Conrail employees always have been subject to Rule G or its equivalent, an industry-wide rule, which prohibits the use or possession of "intoxicants, narcotics, amphetamines or hallucinogens" by employees on duty or the use of such substances by employees subject to duty, and which requires employees under medication to be certain that their safe performance of duty is not compromised. This rule has been enforced in the past principally by supervisory observation.

Conrail has routinely used drug screening urinalysis as part of the return-to-duty medical examination of any employee previously taken out of service because of a drug-related problem, and in both periodic and return-to-duty examinations, when the examining physician suspected drug abuse. In applying Rule G. Conrail "encourag[ed] employees who are suspected of being drug or alcohol abusers to voluntarily agree to undergo blood, urine, or other diagnostic tests." *See* App. at 70; *cf. Brotherhood of Locomotive Eng'rs v. Burlington Northern R.R. Co.*, 838 F.2d 1087, 1089 (9th Cir.1988) (railroad's employee suspected of drug use could avoid suspicion by voluntarily submitting to urinalysis); *Brotherhood of Maintenance of Way Employees v. Burlington Northern R.R. Co.*, 802 F.2d 1016, 1018 (8th Cir.1986) (Arnold, J., for a unanimous court, concurring in part) (same).

In February 1986, the regulations of the Federal Railway Administration on "Control of Alcohol and Drug Use in Railroad Operations" became effective. 49 C.F.R. § 219 (1987). These regulations require post-accident drug screening by urinalysis, breathalizer and/or blood testing for all employees covered by the Hours of Service Act, 45 U.S.C. § 61–64b (1982), *i.e.*, for operating employees.[1] Employees reasonably suspected of being under the influence of a prohibited substance may also be tested if they are involved in an operating rule violation or contribute to an accident. The application of these regulations to covered employees is not at issue on this appeal.

---

1. The Hours of Service Act applies to any "individual actually engaged in or connected with the movement of any train," but not to all railroad employees. 45 U.S.C. § 61(b)(2). The Court of Appeals for the Ninth Circuit has re-cently held the Federal Railway Administration regulations to be unconstitutional under the Fourth Amendment. *See Railway Labor Executives' Ass'n v. Burnley*, 839 F.2d 575 (9th Cir. 1988). That issue is not before us.

On February 20, 1987, Conrail announced its unilateral decision to include a drug screen as part of the urinalysis in all periodic and return-to-duty examinations, and in any special examinations deemed necessary by the physician after a return from a drug-related absence from duty. The Unions filed suit in district court alleging that Conrail's action violated Section 6 of the Railway Labor Act, 45 U.S.C. § 156 (1982), and the Fourth Amendment's prohibition of unreasonable search and seizure and sought to enjoin Conrail from instituting the drug testing.

All parties moved for summary judgment. The district court, based on the facts set forth above, concluded that "Conrail's decision to expand its use of drug testing is arguably justified under terms of the parties' long-standing medical policy." *See Railway Labor Executives' Ass'n v. Conrail*, No. 86–2698, slip op. at 3 (E.D.Pa. April 28, 1987). It therefore found the dispute to be a "minor" one and dismissed the counts of the complaint based on the Railway Labor Act. The court also dismissed the Fourth Amendment claim on the ground that Conrail is not a government enterprise. *Id.* at 3–4. The Unions appeal only the order dismissing the Railway Labor Act counts.

■ The district court's conclusion that the drug-testing program constitutes a minor dispute is a legal determination. *Brotherhood of Locomotive Eng'rs v. Burlington Northern R.R. Co.*, 838 F.2d at 1089; *see Goclowski v. Penn Central Transp. Co.*, 571 F.2d 747, 755 (3d Cir. 1977); *United Transp. Union v. Penn Central Transp. Co.*, 505 F.2d 542, 543–45 (3d Cir.1974). *But see Railway Labor Executives' Ass'n v. Norfolk and Western Ry. Co.*, 833 F.2d 700, 707 (7th Cir.1987). Because the district court dismissed the claims pursuant to the undisputed facts, its order, akin to a grant of summary judgment, is subject to plenary review. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977); *cf. Medical Fund-Philadelphia Geriatric Center v. Heckler*, 804 F.2d 33, 36 (3d Cir.1986) ("dismissal of a complaint for lack of jurisdiction ... raises a question of law subject to plenary review").

### B. Major and Minor Disputes

This court has recently had occasion to review the statutory background of the Railway Labor Act in *Railway Labor Executives' Association v. Pittsburgh & Lake Erie Railroad Co.*, 845 F.2d 420 (3d Cir. 1988). Therefore, we will only briefly discuss the provisions relating to major and minor disputes insofar as necessary to an understanding of the issue before us.

The Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, was passed in 1926 to facilitate labor peace in the railroad industry, then the backbone of the American transportation system. *See* H.R.Rep. No. 328, 69th Cong., 1st Sess. 1–3 (1926) [hereinafter *1926 House Report*]; *Baker v. United Transp. Union*, 455 F.2d 149, 153–54 (3d Cir.1971). In an unprecedented cooperative process, the Act was drafted by negotiators for railroad management and labor and presented to Congress as, essentially, a finished product. *See 1926 House Report* at 1, 3. In its original form, the Act did not provide compulsory arbitration for any claim; it worked instead to prevent strikes and lockouts by funneling disputes into "purposely long and drawn out [procedures], based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." *Brotherhood of Ry. & S.S. Clerks v. Florida East Coast Ry. Co.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966); *see Elgin, Joliet & Eastern R.R. v. Burley*, 325 U.S. 711, 725–27, 65 S.Ct. 1282, 1290–91, 89 L.Ed. 1886 (1945).

From the beginning, the Act made a distinction between disputes arising from grievances and the interpretation of a contract ("minor" disputes), on the one hand, and disputes arising from changes in pay rates, work rules and working conditions ("major" disputes), on the other. *See* Railway Labor Act, Pub. L. No. 257, §§ 3, First, 5(a)–(b), 6, 44 Stat. 577, 578–82 (1926); *see also Brotherhood of R.R.*

*Trainmen v. Chicago R. & I. R.R. Co.*, 353 U.S. 30, 35, 77 S.Ct. 635, 637, 1 L.Ed.2d 622 (1957). Originally, minor disputes could be submitted to binding arbitration by "adjustment boards" composed of equal representatives of labor and management voluntarily established by the parties. The inability of the parties to agree to such boards and the deadlock in thousands of disputes before boards led Congress to amend the Act in 1934 to create the National Railroad Adjustment Board before which either side in a minor dispute can submit the issue to compulsory arbitration if the parties have not agreed on their own arbitrators. Railway Labor Act, ch. 691, § 23, 48 Stat. 1185, 1189–93 (1934); *Trainmen*, 353 U.S. at 39, 77 S.Ct. at 639; Elgin, 325 U.S. at 726, 65 S.Ct. at 1291. *See generally* Garrison, *The National Railroad Adjustment Board: A Unique Administrative Agency*, 46 Yale L.J. 567, 574–76 (1937). The carrier is not barred in minor disputes from introducing the disputed change during the pendency of the arbitration proceedings. *See* 45 U.S.C. § 153; *Goclowski v. Penn Central Transp. Co.*, 571 F.2d 747, 754 n. 6 (3d Cir.1977); *cf.* 45 U.S.C. § 156.

In contrast, parties to a major dispute have always been required to proceed through a more extensive mediation and conciliation mechanism as specified by sections 5 and 6 of the Act, 45 U.S.C. §§ 155–56; *see 1926 House Report* at 3–5; Elgin, 325 U.S. at 725–26, 65 S.Ct. at 1290. During this process, the parties are entitled to an injunction, if necessary, to preserve the status quo. *United Transp. Union v. Penn Central Transp. Co.*, 505 F.2d 542, 543 (3d Cir.1974) (per curiam).[2]

The legislative history makes clear that labor's acquiesence to the RLA's procedure, including management's right to introduce changes in "minor" dispute situations, was dependent on the general understanding that "minor" disputes, with their attendant compulsory arbitration, were to

be limited to "comparatively minor" problems, "represent[ing] specific maladjustments of a detailed or individual quality," Elgin, 325 U.S. at 724, 65 S.Ct. at 1290, in contrast to the "large issues about which strikes ordinarily arise," *id.* at 723–24, 65 S.Ct. at 1290. *See Trainmen*, 353 U.S. at 39, 77 S.Ct. at 640 (general understanding was that compulsory arbitration covered only a "limited field"). *See generally* Garrison, *supra*, at 586–91 (describing typical minor disputes).

The classic explanation of the distinction between major and minor disputes appears in *Elgin*. Major disputes are said to arise "where there is no [collective bargaining] agreement or where it is sought to change the terms of one.... They look to the acquisition of rights for the future, not the assertion of rights claimed to have vested in the past." 325 U.S. at 723, 65 S.Ct. at 1290. Minor disputes arise where an existing agreement is being applied, "a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Id.; accord Trainmen*, 353 U.S. at 33, 77 S.Ct. at 636 ("These are controversies over the meaning of an existing collective bargaining agreement, generally involving only one employee.")

█ We have adopted the following test to assist in determining whether the dispute is a minor one:

[I]f the disputed action of one of the parties can "arguably" be justified by the existing agreement or, in somewhat different statement, if the contention that the labor contract sanctions the disputed action is not "obviously insubstantial", the controversy is [a minor dispute] within the exclusive province of the National Railroad Adjustment Board.

2. There are four, narrowly-cabined situations in which a district court may have subject-matter jurisdiction in a minor dispute despite non-exhaustion of the arbitration procedures. *Childs v. Pennsylvania Fed. Bhd. of Maintenance of Way Employees*, 831 F.2d 429, 437–38 (3d Cir.

1987). One of them, applicable "when resort to administrative remedies would be futile," *Sisco v. Conrail*, 732 F.2d 1188, 1190 (3d Cir.1984), has been raised by the Unions here. Because of our disposition of the case, we do not reach this question.

*Local 1477 United Transp. Union v. Baker,* 482 F.2d 228, 230 (6th Cir.1973), *quoted in United Transp. Union v. Penn Central,* 505 F.2d at 544; *accord, e.g., Brotherhood of Locomotive Eng'rs v. Burlington Northern R.R. Co.,* 838 F.2d 1087, 1091 (9th Cir.1988). For this purpose, it is not necessary that the terms of a collective bargaining agreement governing relations under the Act be embodied in a written document; instead they may be inferred from habit and custom. *See Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); *Brotherhood of Locomotive Eng'rs v. Burlington Northern,* 838 F.2d at 1091–92; *Brotherhood of Maintenance of Way Employees v. Burlington Northern R.R. Co.,* 802 F.2d 1016, 1022 (8th Cir.1986) (Arnold J., for a unanimous court, concurring).

In this case, the district court found, and the parties do not dispute, that Rule G and the medical examination policy, although not incorporated in the parties' written agreement, constitute implied-in-fact contractual terms. Thus, we reach the principal issue: whether Conrail's imposition of a drug screen was an interpretation of one or both of these agreements thereby constituting it as a minor dispute under 45 U.S.C. § 153, First, (i), which it could institute unilaterally, or whether its attempt to impose such a drug screen was a new term constituting a major dispute under 45 U.S. C. § 152, Seventh, over which it must bargain.

## II.  *Discussion*

The Unions argue that the incorporation of a drug-screen test as an element of the urinalysis required in all periodic and return-to-duty physical examinations is a change in the existing rules and working conditions. They argue that the working conditions had not previously encompassed testing employees for drugs without some particularized suspicion or past medical problem and therefore the across-the-board testing is a major dispute within the jurisdiction of the district court. They also argue that the drug-screen represents a new method of enforcing Rule G, which

had been enforced primarily by supervisory observation. Such a unilateral change in the method of enforcement, they contend, constitutes a major dispute.

Conrail responds that the addition of drug screening is arguably justified by the parties' long-standing implied-in-fact agreement authorizing Conrail to test the urine of employees to identify workers who are medically unfit for duty. It claims that the new screening is within its prerogative to modify its medical standards and procedures as a result of advances in medical science and medical technology. Conrail contends that because there was no practice of requiring some medical evidence of drug usage prior to urinalysis as part of its routine medical examination, its new program which adds the drug-screen component to such urinalysis is not a significant departure from past practice.

### A.

Three other courts of appeals have considered the same or similar drug-testing issues under the RLA, with varying results and rationales. In a pair of cases, the Ninth Circuit denominated as major disputes the use of drug-detecting dogs, *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.,* 838 F.2d 1102 (9th Cir.1988) (Dog Search Case), and mandatory urinalysis testing of crew-people implicated in "human-factor" accidents or operating-rule violations, *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.,* 838 F.2d 1087 (9th Cir.1988) (*Chemical Testing Case*), as a means of enforcing Rule G.

The majority's decision in the *Chemical Testing* Case was based chiefly on the "critical differences between the old method and the new method: the old method of enforcing Rule G was voluntary, and required particularized suspicion; the new method is mandatory, and requires only generalized suspicion." *Id.* at 1092. It noted that the enforcement method employed in the past—the supervisor's "observing an employee's gait, breath, odor, slurred speech, or bloodshot eyes—was

non-intrusive." *Id.* It rejected the railroad's claim that the union, by acquiescing "in Rule G's enforcement by sensory surveillance can be said to have agreed to allow [the railroad] to implement *any* procedure beyond sensory surveillance so long as the procedure is brought into play by ... an 'objective triggering event.'" *Id.* The court also noted that it had recently held that the Fourth Amendment was violated by Federal Railway Administration regulations which imposed a similar testing program based only on generalized suspicion arising from an accident. *Id.* at 1093 (citing *Railway Labor Executives' Ass'n v. Burnley,* 839 F.2d 575 (9th Cir.1988)). The court ruled that it would construe the implied agreement with the railroad in enforcing Rule G as containing the same expectation of privacy as to the employer as the worker had as to the government. *Id.* at 1093. Because the new mandatory urine testing program changed the working conditions governed by the bargaining agreement, it was "by definition" a major dispute. *Id.*

In the *Dog Search Case,* involving the use of trained dogs to randomly search for drugs, the court again relied on the fact that previous practice under Rule G had always required "a triggering event", the perception of facts by an official suggesting that a specific employee was under the influence of alcohol or drugs. 838 F.2d at 1105. Furthermore, the court construed the parties' implied agreement as directed to whether an employee was under the influence of a prohibited substance, unlike the newly imposed search which was directed to detecting possession to prevent future use. *Id.*

*Railway Labor Executives Association v. Norfolk & Western Railway Co.,* 833 F.2d 700 (7th Cir.1987), presented the Seventh Circuit with issues almost identical to those we confront here. As here, the railroad added a drug screen to the urinalysis that had been a routine element of the medical examination. Rejecting the unions' argument that the drug-screening intruded into employees' conduct outside of the workplace, the court held that "[t]he addition of a drug screen as a second component of the urinalysis previously required of all employees does not constitute such a drastic change in the nature of the employees' routine medical examination or the parties' past practices that it cannot arguably be justified by reference to the parties' agreement." *Id.* at 706. The court of appeals rejected the unions' argument that the testing was designed to enforce Rule G, holding that the district court's factual finding "that [the railroad] had not made any unilateral changes in the enforcement of Rule G" was not clearly erroneous. *Id.* at 707.

There were two separate testing issues before the Eighth Circuit in *Brotherhood of Maintenance of Way Employees v. Burlington Northern Railroad Co.,* 802 F.2d 1016 (8th Cir.1986). One, which is not at issue here, concerned the railroad's institution of post-incident testing to enforce Rule G. The court unanimously concluded that although the ground rules between the parties governing Rule G enforcement required suspicion of impairment to justify a test, the urinalysis "'of the individual crew member having ... exclusive responsibility for the action triggering the incident'" or other crew members "only when individual responsibility is not clear" satisfied that suspicion requirement and would not be "such a serious departure from past practice as to give rise to a major dispute." *Id.* at 1023 (quoting railroad policy).

The court divided on the second issue, the railroad's institution of a drug screen as part of its periodic and return-to-duty medical exams. Two members of the court tersely reversed the district court's finding that the medical examination screening presented a major dispute. The majority noted that the union did not deny that the agreement allowed medical testing to identify workers who were unfit for duty, and stated that consequently, "all that is involved in the parties' dispute is the extent to which the urinalysis component of these examinations may be refined in order to predict safe employee performance." *Id.* at 1024; *see also International Ass'n of Machinists, District Lodge 19 v. Southern Pacific Transp. Co.,* 105 LRRM 2046 (E.D. Cal.1980) [available on WESTLAW, 1980 WL 2170] (use of alcohol breath test a minor dispute). Judge Arnold, in dissent,

stressed that regardless of whether the testing was characterized as a medical or disciplinary matter, the medical testing program could result in an employee's being fired without any prior suspicion of drug use. 802 F.2d at 1025 (Arnold, J., dissenting in part). "This new examination is universal and indiscriminate, in the sense that it is imposed without regard to any degree of suspicion that the employee is working while impaired." *Id.* at 1024. Such a change, he argued, was too significant to go forward without negotiations between the parties.

### B.

◾ The absence of any uniformity in interpretation by the other courts reinforces our responsibility to make an independent analysis of the applicable law to the undisputed facts. When a court holds that an existing agreement, explicit or implied, arguably justifies a new practice, the court has determined that it is plausible to believe that there was in fact a meeting of the parties' minds on the general issue. In this case, we must determine whether the existing agreement arguably admits of an implied term encompassing the new drug screening. *See Chemical Testing Case,* 838 F.2d at 1092–93; *cf. Transportation–Communication Employees Union v. Union Pacific R.R. Co.,* 385 U.S. 157, 160–61, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966) ("In order to interpret [a collective bargaining] agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements.")

The district court held that the new testing was arguably within the terms of the existing medical examination agreement. We reach a contrary legal conclusion because the undisputed terms of the implied agreement governing medical examinations

cannot be plausibly interpreted to justify the new testing program.

Under the stipulation agreed to by the parties, use of a drug screen was included as part of the urinalysis in return-to-duty physical examinations "when the employee has been previously taken out of service for a drug-related problem, or when, in the judgment of the examining physician, the employee may have been using drugs." App. at 71. It was included as part of the periodic physical examination only in the latter situation, "when, in the judgment of the examining physician, the employee may have been using drugs." App. at 71–72.

Conrail argues that because it has been conducting drug-screen urinalysis from time to time since 1976, there is an arguable contractual basis for its imposition of drug screening as part of its routine medical examinations.[3] This argument overlooks what to us is the determinative distinction between the old and new practice: before, drug screening was included only when there was particularized cause and not as part of the routine urinalysis. The fact that the prior agreement encompassed drug screening only in instances where there was cause and limited the routinely administered urinalysis to tests for blood sugar and albumin persuades us to reject Conrail's argument that the medical testing agreement justifies testing without cause.

If we were to accept Conrail's argument that its prior medical testing justified the drug screen, it would expand the scope and effect of medical testing beyond that of Rule G, the disciplinary rule aimed specifically at substance abuse. Under Rule G, only employees who are impaired while on the job or on call may be disciplined, whereas an employee whose drug use is detected through the new medical testing program may be fired even though s/he was never found to be impaired while at work or subject to duty.

---

**3.** In 1984, Conrail issued a new medical standards manual requiring a drug screen to be carried out in connection with all periodic examination urinalyses. The mandated testing was performed in only one of its four administrative regions, and was discontinued for budgetary reasons after six months. Conrail does not contend that this period of limited uniform testing without the apparent knowledge or

agreement of the Unions worked a change in the parties' general agreement governing medical testing. *See generally Baker v. United Transp. Union,* 455 F.2d 149, 156 (3d Cir.1971) (practice became part of parties' agreement where "the railroad has engaged in a certain activity over a sufficient period of time for the union to become aware of it and react accordingly if it objects").

Ultimately, Conrail's argument rests on the premise that testing urine for cannabis metabolites is no different in kind from testing urine for blood sugar. This ignores considerable differences in what is tested for and the consequences thereof. Employee drug testing is a controversial issue throughout the railroad industry and beyond. *See, e.g., Jones v. McKenzie,* 833 F.2d 335 (D.C. Cir.1987) (school bus attendants); *National Treasury Employees Union v. Von Raab,* 816 F.2d 170 (5th Cir. 1987) (Customs Service employees), *cert. granted,* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); *Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir.) (race track jockeys), *cert. denied,* —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986); *Transport Workers' Union of Philadelphia .v. Southeastern Pennsylvania Transp. Authority,* 678 F.Supp. 543 (E.D.Pa.1988) (municipal transport workers); *Association of Western Pulp and Paper Workers v. Boise Cascade Corp.,* 644 F.Supp. 183 (D. Or.1986) (paper mill workers); *Patchogue–Medford Congress of Teachers v. Board of Education,* 70 N.Y.2d 57, 517 N.Y.S.2d 456, 510 N.E.2d 325 (1987) (school teachers). The practice poses serious ethical and practical dilemmas as well. *See, e.g., Substance Abuse in the Workplace: Readings in the Labor-Management Issues* (R. Hogler ed. 1987) [hereinafter *Substance Abuse* ] (collecting commentary). We regard it as particularly significant that the General Counsel of the National Labor Relations Board has taken the position that drug screening, even where it is added to a pre-existing medical examination program, constitutes a substantial change in working conditions and is a mandatory subject of bargaining under the National Labor Relations Act. *See* National Labor Relations Board, Office of the General Counsel Mem. GC 87–5 (Sept. 8, 1987), *reprinted in* Daily Labor Report (BNA), No. 184 at D–1 (Sept. 24, 1987) ("When conjoined with discipline, up to and including discharge, for refusing to submit to the test or for testing positive, the addition of a drug test substantially changes the nature and fundamental purpose of the existing physical examination.")

The function of bargaining over major disputes is obviously to reach agreement on terms and conditions which have not yet been addressed. Conrail cannot point to any existing agreement between the parties on such crucial matters as the drug test to be used, the methods of confirming positive results, and the confidentiality protections to be employed. *Cf. Shoemaker,* 795 F.2d at 1140, 1144; Rothstein, *Screening Workers for Drugs,* in *Substance Abuse, supra,* 115, 116–22. We search the past practices of the parties in vain for any indication of an agreement on these key matters. It follows that the agreement governing prior medical examinations cannot be strained to include, even arguably, an agreement to routinely perform a drug screen.

### C.

The Unions also argue that the new testing is a change in working conditions in that it represents a change in the method of enforcing Rule G, which is itself a working condition. Conrail denies that its drug testing is designed to enforce Rule G, but argues that even if it were, the implementation of a new procedure to enforce Rule G would be a minor dispute. As we noted before, the only court of appeals to reach the issue of the characterization for RLA purposes of a change in the method of enforcement of Rule G ruled that it raised a major dispute. *See Chemical Testing Case,* 838 F.2d at 1092–93; *see also Brotherhood of Maintenance of Way Employees v. Burlington Northern R.R. Co.,* 802 F.2d at 1024–25 (Arnold, J., dissenting in part). However, in light of Conrail's disavowal of Rule G as a justification for the newly imposed drug screen and our conclusion that the existing medical policy did not arguably justify the drug screen, we need not reach the Rule G enforcement issue.

### III. *Conclusion*

As we have explained above, Conrail's addition of drug screening to the urinalysis examination of employees as to whom Conrail has no particularized suspicion of drug use changes the terms and conditions governing the employment relationships. It therefore constitutes a major dispute which Conrail cannot impose unilaterally. In-

stead, the RLA requires that the parties must bargain under the prescribed procedure.

In so holding, we do not minimize the serious drug and alcohol problem in the transportation industry. *See, e.g.,* De Rosa, *Alcohol Problems in the Railroad Industry, in Substance Abuse, supra,* 29, 29 (reporting estimate that some 25 percent of railroad workers drink on duty or while subject to duty); *New Regulations to Control Substance Abuse in the Transportation Industry,* in *id.* at 31 (alcohol and drug abuse responsible for 37 deaths, 80 injuries and $34 million in property damage between 1975 and 1985). We also note that the Unions have stated in their brief that they "yield to no one in abhorence [sic] of alcohol or drug use in employment, or in the desire to purge the industry of their adverse effects." Appellants' Brief at 4. They will have an opportunity to effectuate this desire at the bargaining table.

The order of the district court dismissing the complaint for lack of subject matter jurisdiction will be reversed and the case remanded for further proceedings consistent with this opinion.