ALLIED PILOTS
ASSOCIATION, Plaintiff,

v.

AMERICAN AIRLINES, INC.,
Defendant.

Civ. A. No. CA 3–88–1914–G.

United States District Court,
N.D. Texas,
Dallas Division.

April 27, 1989.
Supplemental Order May 11, 1989.

Martin Seham and Andrew E. Zelman, Seham, Klein & Zelman, New York City, and G. William Baab and Sandord R. Denison, Mullinaux, Wells, Baab & Cloutman, Dallas, Tex., for plaintiff.

Richard A. Malahowski and Maureen F. Moore, American Airlines, Inc., Fort Worth, Tex., and Harry A. Rissetto, Donald L. Havermann and Roy A. Sheetz, Washington, D.C., for defendant.

## MEMORANDUM ORDER

FISH, District Judge.

This case is before the court on plaintiff's motion for a preliminary injunction. Upon review of all the submissions, the court is of the opinion that the motion should be granted.[1]

### I. *Background*

Defendant American Airlines, Inc. ("American") is a carrier by air. Plaintiff

---

1. This memorandum will constitute the findings of fact and conclusions of law required by F.R. Civ.P. 52(a).

Allied Pilots Association ("APA") is the duly certified labor organization representing the pilots employed by American. Since 1963, American and the APA have negotiated several collective bargaining agreements which have governed the terms and conditions of employment for American's pilots. Vogel Affidavit of September 8, 1988 ("Vogel Affidavit") ¶ 2. The most recent labor agreement became effective on March 1, 1987 and continues in effect until December 31, 1989. Vogel Affidavit, Exhibit A ("Agreement between American and APA" ["the Agreement"] at 34–1). The Agreement does not contain a "management rights" clause.

Since at least 1947, American has had in place unilateral rules regulating and prohibiting the use of drugs and alcohol. Miller Affidavit ¶ 4. In May 1984, American unilaterally promulgated its current rules on this subject ("the Rules"):

> 25. Reporting for or carrying on work while showing any signs of the use of intoxicants, or knowingly permitting another employee to do so, is prohibited.
> 26. Possession or drinking of any intoxicants on Company premises at any time, or drinking intoxicants in public while wearing uniform with AA emblem or insignia, is prohibited.
> 33. Possession, dispensing or using a narcotic, barbiturate, mood-ameliorating, tranquilizing or hallucinogenic drug, either on or off duty, except in accordance with medical authorities, is prohibited.

Miller Affidavit ¶ 7, Exhibit C.

American has historically enforced these rules through reliance on the sensory perceptions of individual observers. Vogel Affidavit ¶¶ 5, 7. From 1982 to the present, there has been cause for application of the Rules to pilots in only two or three instances. Vogel Affidavit ¶ 5. All investigations of pilots have been performed by a Flight Department supervisor. Malone Affidavit ¶ 15.

No pilots were required or asked to submit to alcohol or drug testing during disciplinary investigations prior to publication in March, 1988 of the new policy at issue here. Defendant's Memorandum In Opposition to Plaintiff's Motion for Preliminary Injunction at 11.

On March 1, 1988, American unilaterally issued Appendix A to Regulation 135–1 ("Appendix A"), entitled "American Airlines Drug and Alcohol Policy." Miller Affidavit ¶ 15. Under it, whenever American "has reasonable suspicion" to believe that an employee is violating one of the Rules, it "will require the employee, as a condition of continued employment, to cooperate in urinalysis testing." Vogel Affidavit, Exhibit D ¶ E. Although the APA requested collective bargaining with respect to Appendix A's adoption, American refused. Vogel Affidavit ¶ 10; Answer ¶ 9.

Since the filing of this motion, the Federal Aviation Administration ("FAA") has promulgated a Final Rule requiring drug urinalysis for pilots and other airline personnel. The Department of Transportation ("DOT") has promulgated an Interim Final Rule regarding the procedures for workplace drug testing programs. The regulations mandate reasonable suspicion drug urinalysis, as well as pre-employment and random tests. They also contain a number of safeguards and limitations, discussed in detail below at 12–14. *See* FAA, Anti-Drug Program for Personnel Engaged in Specified Aviation Activities: Final Rule, 53 Fed.Reg. at 47057 (Nov. 21, 1988) ("Final Rule").

## II. *Analysis*

To obtain a preliminary injunction, a movant must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that irreparable injury will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the non-movant; and (4) granting the injunction is not adverse to the public interest. *Mississippi Power & Light Co. v. United Gas Pipe Line, Co.,* 760 F.2d 618, 621 (5th Cir.1985); *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974). The decision to grant or deny a preliminary injunction is left to the sound discretion of the district court. A preliminary injunction is an extraordinary remedy which should only be granted if the movant has carried

his burden of persuasion on all of the four factors. *Mississippi Power & Light,* above, 760 F.2d at 621. For the reasons stated below, the court concludes that the APA has satisfied its burden on each of the four factors.

### A. Substantial Likelihood of Success on the Merits

 The only issue in this case is whether collective bargaining between American and the APA was required before American implemented Appendix A with regard to pilots. Neither the constitutionality, nor the propriety, of drug and alcohol testing is at issue. To determine whether this court has the power to enjoin American from applying Appendix A to APA's members until collective bargaining occurs, this court must determine whether the dispute between American and the APA is "major" or "minor" within the context of the Railway Labor Act, 45 U.S.C. § 151, *et. seq.* If the dispute is major, the court may issue an injunction to maintain the status quo pending exhaustion of the applicable statutory procedures (mediation, arbitration, possible Presidential intervention). *Detroit and Toledo Shore Line Railroad Company v. United Transportation Union,* 396 U.S. 142, 147–50, 90 S.Ct. 294, 297–99, 24 L.Ed.2d 325 (1969). On the other hand, if the dispute is minor, the parties must arbitrate it before a system board of adjustment, during which time the employer may unilaterally introduce the disputed change. *Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 726, 65 S.Ct. 1282, 1291, 89 L.Ed. 1886 (1945); *International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Airline Division v. Southwest Airlines Co.,* 842 F.2d 794, 803 (5th Cir.), *reh'g en banc granted,* 853 F.2d 283 (5th Cir.1988).

 Major disputes arise when there is either no collective bargaining agreement or a change in the terms of an existing agreement is sought. Minor disputes relate to the meaning of a particular con-tract provision, or its application to a particular situation. *Elgin,* 325 U.S. at 723, 65 S.Ct. at 1289–90. If the proposed change is arguably justified by the existing contract, the dispute is minor. *Railway Express Agency, Incorporated v. Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers,* 437 F.2d 388, 392 (5th Cir.), *cert. denied,* 403 U.S. 919, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971). To determine whether a change is arguably justified by the contract, the court must consider both the contract and the long-standing practices under it. *Detroit and Toledo Shore Line Railroad Company,* 396 U.S. at 153–54, 90 S.Ct. at 301–02; *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern Railroad Company,* 802 F.2d 1016, 1022 (8th Cir.1986) (*"Burlington I"*); *Southwest Airlines,* 842 F.2d at 804.

Three Courts of Appeal have dealt with the issue of whether mandatory drug urinalysis is arguably justified by a collective bargaining agreement or the practices under it. In all three, the employer had in place rules banning the use of drugs and alcohol before the screening plan was adopted. In *Burlington I,* above, the union had not in the past objected to the use of breathalyzers, blood alcohol tests, and urinalyses as means by which an employee could clear himself of an accusation of violating the drug and alcohol rules. *Id.* at 1018. The court held that there was a history of union acquiescence in mechanical drug testing. Therefore, a dispute over the addition of mandatory drug urinalyses based on particularized suspicions of drug use was minor, and the railroad could unilaterally implement the tests. *Id.* at 1022–23.[2]

In *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Company,* 838 F.2d 1087 (9th Cir.1988), *petn. for cert. filed,* 56 U.S.L.W. 3720 (April 19, 1988) (*"Burlington II"*), the Ninth Circuit held that drug urinalyses for crew members involved in human-factor ac-

---

**2.** The railroad's new program allowed drug urinalysis whenever an employee showed physical manifestations of impairment, or was involved in an accident, on-the-job injury, rule violation, or unsafe act. *Id.* at 1019.

cidents or operating rule violations was an issue of major dispute. Employees who refused to submit were subject to discipline. *Id.* at 1089. The court explained that while the union had long acquiesced in the rule banning drug use (and its enforcement by sensory surveillance), it had not acquiesced in the new mandatory generalized suspicion drug tests. As a result, the new drug urinalysis program was deemed the subject of a major dispute. *Id.* at 1092.

In *Railway Labor Executives' Association v. Consolidated Rail Corporation,* 845 F.2d 1187 (3d Cir.), *cert. granted,* —— U.S. ——, 109 S.Ct. 52, 102 L.Ed.2d 31 (1988), the employer, Conrail, added a drug screening component to the employee's medical examinations. It had previously required physical examinations every 1–3 years, which routinely included urinalysis for blood sugar and albumin but not drugs. Moreover, Conrail had used drug urinalysis when an employee taken out of service due to a drug-related problem returned to duty and whenever the examining physician suspected drug abuse. *Id.* at 1188. Because the past practice was limited to drug screens for cause, and the routine urinalysis was restricted to purposes other than drug or alcohol detection, the new procedure could not arguably be justified by the contract or practices under it. *Id.* at 1193.[3]

In the Northern District of Texas, Judge Buchmeyer recently addressed the issue of drug urinalysis for airline employees in *International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Airline Division v. Southwest Airlines Co.,* No. CA 3–86–3103–R (N.D.

Tex. Jan. 9, 1987), *aff'd,* 842 F.2d 794, 803 (5th Cir.), *reh'g en banc granted,* 853 F.2d 283 (1988). There the airline sought to implement mandatory drug and alcohol urine tests after accidents and on management's reasonable suspicion. 842 F.2d at 797–798 & n. 6. The airline's existing rules banned drug and alcohol use. However, neither the rules nor the contract made any provision for drug or alcohol testing. CA 3–86–3103–R, Transcript of Hearing at 110. There was no past practice of routine drug urinalysis. In one specific incident, an employee was offered a drug urinalysis when sensory observation identified him as intoxicated on the job. He refused to take the test. The company disciplined him for being intoxicated, but not for refusing to take the test. *Id.* at 115. Consequently, the court determined that the airline's drug testing program constituted a major dispute. *Id.* at 116, 119.

In the present case, the Agreement itself does not deal with urine and blood tests to detect drug or alcohol use. No clause of the contract, or practice under it, can reasonably be interpreted as justifying the application of Appendix A to the members of the APA.[4] Rules 25, 26, and 33 have historically been enforced through reliance on sensory perceptions of individual observers. Consequently, they cannot be interpreted as "arguably justifying" the application of Appendix A to the pilots. As the courts held in *Burlington II* and *Consolidated Rail,* the existence of rules banning drug and alcohol use cannot arguably justify widespread drug and alcohol testing. This is especially true in light of the fact

---

**3.** The Seventh Circuit has refused to enjoin the unilateral decision to add a drug urinalysis to routine medical examinations when the screen was used only to determine the employee's entry into a rehabilitation program. The court cautioned, however, that it was not deciding whether the use of unilaterally imposed drug screens to detect violations of the drug rule was a major or minor dispute. *Railway Labor Executives Association v. Norfolk and Western Railway Company,* 833 F.2d 700, 707–08 (7th Cir. 1987).

**4.** American has referred the court to its drug screening of other classes of employees. In some cases, American has required employees other than pilots to take the tests; in others, it

has requested that they take the tests to exonerate themselves. Defendant's Memorandum In Opposition to Plaintiff's Motion for Preliminary Injunction at 10–11. Under the Railway Labor Act, however, each employee class is entitled to its own representative. 45 U.S.C. § 152. Consequently, the acquiescence of other employee classes and *their* unions, without collective bargaining, is irrelevant to this case. To hold otherwise would be to require unions representing every class of employees to take immediate action any time that the employer and a union representing one class made a change with respect to that one class, or risk having the change automatically applied to them as well.

that the rules have been enforced by sensory observation. *Burlington II*, 838 F.2d at 1092; *Consolidated Rail*, 845 F.2d at 1191–92.

Moreover, the past practices under the Rules and the Agreement do not arguably justify application of Appendix A to pilots. In the past, all investigations of rule violations by pilots were conducted by a Flight Department supervisor. Malone Affidavit ¶ 15. Under Appendix A, the decision to administer the test may be carried out by any supervisor or person in charge, such as a baggage supervisor. *See* Appendix A ¶ D.

Between the mid–1970's and 1982, American unilaterally required pilots to submit to annual physical examinations by American's Medical Department. These examinations included blood and urine tests for reasons other than drug or alcohol use. Wick Affidavit ¶ 3. The comprehensive medical examinations are governed by ¶ 26D of the Agreement.[5] Under ¶ 26D, examinations are limited to two a year unless American provides written notice stating the reasons that it considers a pilot's health or physical condition to be appreciably impaired. If a pilot fails the examination, he may employ a qualified medical examiner to perform the same examination. If this examiner disagrees with American's physician, a disinterested examiner will further examine the pilot.

Since the mid–1970s, American has required selected pilots to provide blood specimens for tests other than drug or alcohol detection. Such tests are usually ordered for medical reasons, such as a return after a medical leave of absence or after substantial surgery. Wick Affidavit ¶ 4. In 1984 and 1985, nearly 500 furloughed pilots were required to take drug urinalyses before returning to work. Wick Affidavit ¶ 5. In 1984, American administered a blood alcohol test to a pilot who had smelled of alcohol during a medical examination preceding his return to work from a leave of absence. Wick Affidavit ¶ 6. Two pilots, who are currently flying with FAA "special issuance certificates,[6] are subject to random testing for illegal drugs by American's Medical Department, as required by the FAA." Wick Affidavit ¶¶ 7–8.

Appendix A institutes new mandatory drug urinalysis upon reasonable suspicion of drug use. The employee is offered a blood test. American may draw a negative inference from any refusal to take such a test, thus making the blood test near-mandatory. Appendix A ¶ E. The urinalysis may be ordered by the supervisor of the employee's work group or, if he or she is unavailable, any company supervisor or person in charge. Appendix A ¶ D. There is no requirement that the supervisor be trained in detection of drug or alcohol use. Refusal to undergo urinalysis by itself will cause the employee to be discharged. Appendix A ¶ J1.

The practices described above cannot arguably justify the interpretation of the contract as authorizing Appendix A. Nor can the APA be said to have acquiesced in the broad testing program by its past behavior. The medical examinations were subject to strict procedural safeguards. They did not include drug and alcohol tests. The return-to-work tests are likewise not drug or alcohol screens. Moreover, they occur on a limited basis, and are usually ordered for medical reasons. The testing of 500 furloughed pilots four years ago is far from an acquiescence in, or an arguable justification of, applying the far-reaching drug testing program outlined in Appendix A to pilots. A blood alcohol test administered only once, four years ago, cannot arguably justify the application of Appendix A. Nor can the two cases of random drug urinalysis, both administered to pilots who were flying under special certificates. More-

**5.** The medical examinations ceased in 1981; however, ¶ 26D continues to authorize use of the examinations. Plaintiff's Reply Memorandum at 2.

**6.** Many pilots who complete rehabilitation for drug or alcohol dependency and who remain in after-care treatment are issued "special issuance certificates" from the FAA, which qualify them to fly commercial airlines. The FAA has often required such pilots to submit to random testing as a condition of keeping the certificate. Wick Affidavit ¶ 8.

218

over, the combination of all of these practices does not arguably justify the application of Appendix A to pilots. All of these procedures were limited in scope. Two did not even involve drug or alcohol screens. Only one involved a blood alcohol test. The factual circumstances surrounding the procedures likewise distinguishes them from being arguable justifications of Appendix A's application.

The history of mechanical drug detection and of the use of urinalysis to clear employees of drug charges, which was present in *Burlington I*, is absent here. Instead, like the employers in *Consolidated Rail* and *Burlington II*, American is attempting here to impose drug and alcohol tests quite unlike anything done in the past.

Consequently, the court concludes that the APA has a substantial likelihood of prevailing on the merits. The new FAA mandatory drug testing rule does not change this result. It became effective on December 21, 1988 and requires a carrier such as American to submit a drug testing plan within 120 days of that date. The carrier should consider its plan approved by FAA unless it is notified otherwise. The carrier must then implement the plan within 180 days of FAA approval. Thus, the pilots may not be subject to reasonable suspicion testing for quite some time. Final Rule, 53 Fed.Reg. at 47060. More importantly, American's current policy will remain in effect until it can make the necessary changes and submit them for FAA review. Defendant's Supplemental Brief at 3. Also important is the fact that the FAA regulations, unlike Appendix A, include a broad range of safeguards, limit the drugs to be tested for, and do not authorize blood tests or tests for alcohol.

Under the FAA rule, at least two of the "employee's supervisors," one of whom is *trained* in detecting drug use symptoms, must "substantiate and concur in the decision to test an employee who is reasonably suspected of drug use." Final Rule, 53 Fed.Reg. at 47058. The decision to test must be based on a "reasonable and articulable belief" that the employee is using a prohibited drug based on "specific, contemporaneous physical, behavioral, or performance indicators of probable drug use." *Id.* This will limit the possibly of supervisor harassment, given the subjectivity of determining reasonable cause. Anti–Drug Program for Personnel Engaged in Specified Aviation Activities: Notice of Proposed Rulemaking, 53 Fed.Reg. at 8376 (Mar. 14, 1988) ("Notice of Proposed Rulemaking"). Furthermore, a licensed physician must review the results of the testing program, review each confirmed positive result for alternative medical explanations, and process employee requests for retesting. Final Rule, 53 Fed.Reg. at 47059.

Employers must comply with the DOT "Procedures for Transportation Workplace Drug Testing Programs" and may only use drug testing laboratories certified by the Department of Health and Human Services. *Id.* at 47057. The FAA Rule contains very strict chain of custody regulations, and mandates training for employees and supervisors. *Id.* at 47059. Moreover, the DOT Procedures require confirmatory testing: if the initial screen result is positive, the employer must re-test the sample using a more sophisticated test: the GC/MS analysis. *Id.* at 47032. The scope of the tests is limited. Employers may only screen for certain drugs. *Id.* at 47058. The FAA Regulations are limited to urinalysis, not blood tests. *Id.* at 47037. The FAA regulations also exclude alcohol. *See* Notice of Proposed Rulemaking, 53 Fed. Reg. at 8374 (rejecting urine screen for alcohol as "inadequa[te]", and blood screening as "invasive"). As a result, American will have to change several parts of Appendix A to comply with the FAA Rule.

### B. Irreparable Injury

American's continuing unilateral imposition of Appendix A impairs the collective bargaining rights of the APA and its members under the Railway Labor Act, thereby subjecting them to irreparable injury. Moreover, American's drug testing program will be significantly curtailed by the FAA regulations, which are designed in

part to protect employees.[7] Continued application of Appendix A would deprive APA members of these protections. Once the tests are administered, the harm is complete—and irreversible. This is especially true of the blood tests which the FAA rules do not authorize. *See Southwest Airlines,* No. CA 3–86–3103–R, above, Transcript of Hearing at 120. An accusation of violating Appendix A, even if later found to be incorrect, "may be difficult, if not impossible, to erase." *Id*

### C. Balancing the Equities

 If a pilot is abusing drugs or alcohol, the situation is dangerous. However, in the absence of Appendix A, and prior to the submission of a plan complying with the FAA regulations, American may rely, as it always has, on sensory detection of drug and alcohol use. The drug and alcohol rules have resulted in pilot discipline only two or three times, thus indicating a low probability of abuse by APA members. Moreover, American was entitled to submit a complying plan to the FAA as early as December 21, 1988. Consequently, the danger of irreparable injury to American is low. Moreover, because sensory detection is the method by which American will determine whether there is reasonable suspicion to test under Appendix A, American cannot be heard to argue that it will miss abusing pilots if it relies on sensory detection alone.

### D. The Public Interest

The public interest supports issuance of an injunction. The Railway Labor Act and its differing procedures for major and minor disputes provides peaceful and prompt resolution for disagreements in the workplace. Enjoining the application of Appendix A serves the philosophy underlying the act that collective bargaining is the best method to settle labor and management disputes. Furthermore, the FAA regulations on drug testing, unlike Appendix A, were established after comment from parties on all sides of the drug

testing issue. The regulations are sensitive to the need to test and to the need for employee protection from supervisory abuse or erroneous test results. Thus, the public interest is served by enjoining American from implementing testing procedures until those procedures meet the FAA's requirements.

### III. *Conclusion*

Therefore, a preliminary injunction of the application of Appendix A to American's pilots is warranted. Once American submits a drug urinalysis plan to the FAA, it can administer tests in accordance with that plan. If the FAA notifies American that the plan does not comply, American must refrain from administering any drug urinalysis under it until the FAA approves its program. American shall not administer blood or alcohol tests to APA's members until all statutory requirements for the resolution of "major" disputes have been satisfied. Within ten days of this date, the APA shall submit a proposed form of preliminary injunction consistent with this memorandum order.

SO ORDERED.

### SUPPLEMENTAL ORDER

The order of April 27, 1989 is ORDERED supplemented to the following extent: on April 14, 1989, the Federal Aviation Administration published supplemental regulations extending the due date for submission of carrier drug plans by 120 days. As a result, the deadlines noted on page 13 of the April 27, 1989 order have been extended by an additional 120 days.

---

7. For example, two supervisors must concur in the decision to test, supervisors must receive detection training, and a licensed physician must verify the results.